UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARC S. EHRLICH, Trustee for
Hoffmans Trade Group LLC,

                                Appellant,

        -against-                        1:16-CV-0070 (LEK)

COMMERCIAL FACTORS OF
ATLANTA,

                                Appellee.

———————————————————————

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Appellant Marc S. Ehrlich, acting as trustee for Hoffmans Trade Group LLC ("HTG"),
appeals a decision by U.S. Bankruptcy Judge Robert E. Littlefield, Jr., dismissing in its entirety
his Adversary Complaint. Dkt. No. 1 ("Bankruptcy Order") at 6–8; Dkt. No. 6 ("Appellant
Brief"). Appellee Commercial Factors of Atlanta ("CFA") filed a Response, and Ehrlich filed a
Reply. Dkt. Nos. 7 ("Response"), 9 ("Reply"). For the reasons that follow, the Bankruptcy Order
is affirmed.

## II.    BACKGROUND

HTG is a New York limited liability company whose sole member and owner is Gael
Coakley, a resident of Latham, New York. Dkt. No. 2-1 ("Adversary Complaint") ¶ 7. CFA is a
Georgia corporation. Id. ¶ 8. HTG entered bankruptcy on June 28, 2013, and Ehrlich was
appointed Chapter 7 Trustee on August 2, 2013. Id. ¶¶ 4–5.

The relationship between HTG and CFA began in March 2011, when HTG "entered into
a 'Security Agreement' with CFA 'to obtain short-term financing by factoring, selling, and

assigning to [CFA] acceptable accounts receivable at a discount below face value.'" Id. ¶ 18 (alteration in original); id. Ex. A, ¶ 1. In other words, HTG would sell goods to a customer and in return receive an invoice representing the amount the customer owed HTG for the goods. Needing cash now rather than later, HTG would sell the invoice to CFA for a discount, and CFA would receive the income stream represented by the invoice.[1] The March agreement contemplated that HTG might receive an income stream related to an invoice that had been sold to CFA. Id. Ex. A, ¶ 46. In that case, HTG would "immediately turn over to [CFA] the . . . payment received by [HTG from the third party]." Id. The agreement also stated that CFA would "have full recourse against [HTG]" for payment on the accounts receivable. Id. ¶ 36. At the same time, HTG and CFA executed a "Notification Agreement," "request[ing] [the third parties'] cooperation in remitting payments on all open invoices as well as those subsequently received to [CFA]." Id. Ex. B.

In April 2011, HTG and CFA entered another agreement, this time to "confirm [HTG's] understanding and agreement regarding the loan(s) [HTG] ha[s] requested [CFA] to make to [HTG]." Id. Ex. C at 1. The agreement stated that HTG would "assign to [CFA] as absolute owner, with full recourse, all Accounts [receivable] . . . which we shall provide to you from time to time." Id. Ex. C, ¶ 2.1. HTG's line of credit was limited to $250,000. Id. As with the March

---

[1] This type of transaction is known as "factoring." See Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 234 (2d Cir. 1999) ("Factoring is a form of financing that allows a manufacturer to obtain immediate payment for the goods it sells even though the buyer is not obligated to pay for those goods until the conclusion of a credit period, usually months after the sale. As soon as the manufacturer ships goods to a buyer, the factor pays the manufacturer the purchase price [or a discounted purchase price] evidenced by the invoice. In return, the factor obtains the right to receive payment on the invoice from the buyer at the conclusion of the credit period, as well as the right to collect related expenses from the manufacturer.").

agreement, the agreement contemplated the possibility of HTG's turning over to CFA any payments received by HTG under an invoice. Id. ¶ 8. The parties acknowledged that the agreement "embodie[d] [their] entire agreement as to the subject matter hereof and supersede[d] all prior agreement as to the subject matter hereof." Id. ¶ 21. HTG also granted CFA a security interest in the following items:

> all of our presently existing and after acquired accounts, inventory, equipment, goods, instruments including promissory notes, chattel paper, payment intangibles, investment property, documents, deposit accounts, letter-of-credit rights, general intangibles, supporting obligations, reserves, reserve accounts and to the extent not listed above as original collateral all products and proceeds of the foregoing, and all of our rights as an unpaid vendor or lienor, all of our rights of stoppage and transit, replevin, and reclamation, and all of our rights against third parties with respect to the foregoing.

Id. ¶ 5. In the event of default, CFA would be entitled to "[t]ake possession of any or all of the Collateral." Id. ¶ 14(c). The agreement defined "security interest" as "the security interest . . . granted by [HTG] to [CFA] as collateral for the payments of any and all obligations." Id. ¶ 1.15. The agreement further defined "obligations" as

> all of our obligations to you hereunder, all obligations of ours to you under any note, contract of surety, guaranty, or accommodation, or with respect to letters of credit or acceptances, sums owing to you for goods and/or services purchased from any other firm factored or financed by you, and all other obligations of ours to you, however and whenever created, arising or evidenced, whether direct or indirect, through assignment from third parties in the ordinary course of your business, absolute, contingent or otherwise, now or hereafter existing or due to become due.

Id. ¶ 1.7. Uniform Commercial Code ("UCC") financing statements were executed to perfect CFA's security interest, id. Exs. G–J, and a "Notification Agreement" that is identical to the one executed in March was put into effect, id. Ex. D.

On September 22, 2011, HTG and CFA entered an addendum to the March agreement. Id. Ex. E. It remains unclear why the parties decided to supplement the March agreement when the parties had entered a new agreement in April that was meant to completely supersede the earlier one. In any event, in the addendum CFA agreed to increase HTG's maximum account to $700,000. Id. Then, on December 10, 2012, the parties entered another addendum, this time to increase the maximum account to $1,400,000. Id. Ex. F.

From March 2011 to February 2012, CFA received payments on the invoices directly from HTG's customers. Adversary Compl. ¶¶ 48, 52. In Fall 2012, HTG began paying CFA directly, and Coakley's scheme to defraud CFA began in earnest. Id. ¶ 49. For reasons that remain murky, HTG started selling phony invoices to CFA. Id. ¶ 63. HTG eventually had to make good on these sales, but how to do so when the invoices were fabricated? Ever resourceful, Coakley came up with a plan. When CFA needed to be paid on an invoice, HTG "would submit another phony invoice and . . . utilize the payment on the newest phony invoice to [pay off the earlier invoices]." Id. ¶ 65. This continued until March 2013, when the payments to CFA stopped. Id. ¶ 52. HTG's counsel conceded that CFA was a "net loser" in these transactions. Dkt. No. 7-1 ("Hearing Transcript") at 26:23.

On July 1, 2014, CFA filed a proof of claim "asserting a secured claim against [HTG] in the amount of $1,306,020.00, plus interest." Adversary Compl. ¶ 17. On July 30, 2015, Ehrlich, acting as trustee of HTG, filed this Adversary Complaint against CFA. Id. Ehrlich wants $1,106,360.29 plus interest from CFA, an amount that represents the transfers made directly from HTG to CFA. Id. at 31. As the Court just recounted, these transfers were made entirely with cash that HTG fraudulently obtained from CFA. The Adversary Complaint contains sixteen counts,

which boil down to fraudulent conveyance, breach of contract, unjust enrichment, declaratory judgment, breach of the covenant of good faith and fair dealing, breach of fiduciary duty (and aiding and abetting thereof), and equitable subordination. Id. ¶¶ 78–194. On January 6, 2016, Judge Littlefield held a hearing on CFA's motion to dismiss the Adversary Complaint. Hearing Tr. At the hearing, Judge Littlefield announced that he would dismiss the Adversary Complaint in its entirety. Id. at 65:3–24. He relied solely on Sharp International Corp. v. State Street Bank & Trust Co. (In re Sharp International Corp.), 403 F.3d 43 (2d Cir. 2005), in reaching this decision. Hearing Tr. at 65:3–15. On January 13, 2016, Judge Littlefield issued an order dismissing the Adversary Complaint in its entirety. Bankruptcy Order. The Bankruptcy Order, which is three pages long, does not explain Judge Littlefield's reasoning. Id.

On January 19, 2016, Ehrlich filed a notice of appeal of Judge Littlefield's ruling. Dkt. No. 1 at 9–10. Ehrlich's opening brief largely incorporates by reference arguments he made to Judge Littlefield. Appellant Br. Ehrlich does this in part because the Bankruptcy Order "contains no analysis, rationale or application of the law to any of the sixteen (16) counts." Id. at 5. The Appellant Brief also fails to recount the factual background of the case—indeed, the facts section of the opening brief reads in its entirety: "For purposes of this appeal (and the Motion) the factual allegations alleged in the Complaint are assumed to be true." Id. at 2. CFA responds by suggesting that Judge Littlefield was correct to dismiss the Adversary Complaint. Appellee Br. at 3.

## III.    LEGAL STANDARD

On appeal, a district court reviews a bankruptcy court's factual findings for clear error and its legal conclusions de novo. County of Clinton v. Warehouse at Van Buren St., Inc., No.

12-CV-1636, 2013 WL 2145656, at *1 (N.D.N.Y. May 15, 2013) (citing R2 Invs., LDC v. Charter Commc'ns, Inc., 691 F.3d 476, 483 (2d Cir. 2012)). Thus, a district court reviews a bankruptcy court's dismissal of a complaint de novo. In re Maxwell Commc'n Corp., 186 B.R. 807, 815 (S.D.N.Y. 1995). To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79.

## IV.    DISCUSSION

### A.  Compliance with Bankruptcy Rule 8014

Under Federal Rule of Bankruptcy Procedure 8014(a), a bankruptcy appellant's opening brief must include, among other things, "a statement of the issues presented," "a concise

statement of the case setting out the facts relevant to the issues submitted for review," and "the argument, which must contain the appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. Bankr. P. 8014(a)(5), (6), (8). Failure to comply with Rule 8014(a) is grounds for dismissing a bankruptcy appeal. Gazes v. Stephenson (In re Stephenson), No. 96-CV-558, 1996 WL 403087, at *1 (S.D.N.Y. July 18, 1996) (collecting cases). Further, "Rule 8014(a) is derived from Federal Rule of Appellate Procedure 28." Reed v. Rescap Borrower Claims Tr. (In re Residential Capital, LLC), 552 B.R. 50, 62 (S.D.N.Y. 2015). Accordingly, a bankruptcy appellant cannot raise an issue for appellate review "merely [by] incorporating by reference an argument presented to the [bankruptcy court]." Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998).

Ehrlich's opening brief violates Rule 8014(a) in several respects. First, it does not contain a statement of the issues presented. Appellant Br. Second, it fails to describe the facts relevant to the appeal. Id. at 2. Third, out of a desire not to "burden th[e] submission" by describing its contentions, the brief mostly incorporates by reference arguments made to Judge Littlefield. Id. at 5. As the Court just mentioned, incorporation by reference is not the proper means of raising an argument for appellate review. Sam's Club, 145 F.3d at 117. The Court could dismiss the appeal because of these failures to comply with Rule 8014(a). See Shah v. Motors Liquidation Co. GUC Tr., No. 12-CV-8783, 2013 WL 12085091, at *6 (S.D.N.Y. June 3, 2013) (finding that a failure to comply with former Rule 8010 (now Rule 8014) is "in and of itself . . . a sufficient basis to dismiss Plaintiff's appeal"). After all, Rule 8014 "is not only a technical or aesthetic provision, but also has a substantive function—that of providing the other parties and the court with some indication of which flaws in the appealed order or decision motivate the appeal." In re

Gulph Woods Corp., 189 B.R. 320, 323 (E.D. Pa. 1995). Yet strict application of Rule 8014

would be inappropriate in this case in light of Judge Littlefield's decision to provide a less-than-

complete explanation of the basis for dismissal. See Miranda v. Bennett, 322 F.3d 171, 176 (2d

Cir. 2003) ("[S]pecification by the [trial] court of its findings of fact and conclusions of law

informs the losing litigant of the reason for that court's ruling and of the principal questions that

he must address if he appeals."). Instead, the Court will address the merits of the parties'

arguments.[2]

### B. Actual Fraudulent Conveyance

Counts two through nine relate to the allegedly fraudulent conveyances that occurred

when HTG paid down debt it owed to CFA with cash HTG had fraudulently obtained from CFA.

Adversary Compl. ¶¶ 84–139. These claims are brought under both New York law and the

Bankruptcy Code. Id. The Court first addresses the actual fraudulent conveyance claims.

Under 11 U.S.C. § 548(a)(1)(A), a "trustee may avoid any transfer . . . of an interest of the

debtor in property . . . that was made or incurred on or within 2 years before the date of the filing

of the petition, if the debtor . . . made such transfer . . . with actual intent to hinder, delay, or

defraud any entity to which the debtor was . . . indebted." Similarly, under New York Debtor and

Creditor Law ("DCL") section 276, "[e]very conveyance made and every obligation incurred

---

[2]  Ehrlich tries to justify his failure to comply with Rule 8014 by claiming that "the
Northern District's Local Rules . . . do not require briefs [to] comply with . . . Rule 8014." Reply
at 7. That is incorrect. Local Rule 76.2(c) states that "[a]ppeals from a decision of the bankruptcy
court shall be in accordance with . . . applicable bankruptcy rules." L.R. 76.2(c). And nowhere in
the Local Rules is there a provision that exempts bankruptcy appellants from Rule 8014. Nor
could there be: "[a]lthough individual bankruptcy courts may promulgate local rules, these rules
must be consistent with the federal Bankruptcy Rules." Townsend v. Sackett (In re Sackett), 135
B.R. 453, 455 (N.D.N.Y. 1992).

with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." These two provisions "are substantially similar such that 'if a transfer is fraudulent under the DCL, it is also fraudulent under Section 548 of the Bankruptcy Code.'" Kramer v. Sooklall, (In re Singh), 434 B.R. 298, 311 n.5 (Bankr. E.D.N.Y. 2010) (quoting Geron v. Schulman (In re Manshul Const. Corp.), No. 99-CV-2825, 2000 WL 1228866, at *43 n.7 (S.D.N.Y. Aug. 30, 2000)). Actual fraudulent conveyance under § 548(a) "looks only to the fraudulent intent of the transferor/debtor," Bayou Superfund, LLC v. WAM Long/Short Fund II, LP (In re Bayou Grp., LLC), 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007), and the same is true for DCL section 276, see Gowan v. Patriot Grp., LLC (In re Dreier LLP), 452 B.R. 391, 432–33 (Bankr. S.D.N.Y. 2011) ("[I]t is the transferor's intent alone, and not the intent of the transferee, that is relevant under [section] 276.").

Ehrlich argues against dismissal of the actual fraudulent conveyance counts on the ground that HTG's fraudulent intent can be presumed because HTG's transactions with CFA were part of a Ponzi scheme. Dkt. No. 2-14 ("Response to Motion to Dismiss") at 17. Under the Ponzi scheme presumption, "any 'transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.'" McHale v. Boulder Capital LLC (In re 1031 Tax Grp., LLC), 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010). So "[a]ctual intent to defraud is presumed as a matter of law when the debtor is engaged in a Ponzi scheme." Carney v. Lopez, 933 F. Supp. 2d 365, 379 (D. Conn. 2013). The Second Circuit has defined a Ponzi scheme as "a fraudulent investment scheme in which money contributed by later investors is used to pay artificially high dividends to the original investors, creating an illusion of profitability, thus attracting new investors." Ades-Berg Inv'rs v. Breeden (In re The Bennett

Funding Grp., Inc.), 439 F.3d 155, 157 n.2 (2d Cir. 2006); accord Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 12 (S.D.N.Y. 2007) ("A key factor [in a Ponzi scheme] is that the Ponzi schemer requires—and secures—new investors to keep the sham arrangement afloat. . . . Another factor is that new monies are used to pay off earlier investors.").

The Adversary Complaint in this case fails to allege the existence of a Ponzi scheme. Recall that in the allegedly fraudulent transfers, HTG paid down its debt to CFA by selling it phony invoices and using the proceeds of those sales to provide CFA payment for earlier invoices. Adversary Compl. ¶ 65. There is something Ponzi-like about this scheme—it involved the use of later-acquired funds to pay down previous debts. But appearances can be deceiving when it comes to transactions that look like Ponzi schemes. See Samuel W. Buell, Capital Offenses: Business Crime & Punishment in America's Corporate Age 46 (2016) ("For understanding modern corporate fraud, the important thing about the idea of a Ponzi scheme is to see what it's not."). Here, only one investor—CFA—was defrauded in the scheme, and as just noted a Ponzi scheme is defined by the use of funds acquired from later investors to pay off earlier investors. See Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n.3 (2d Cir. 1995) ("A Ponzi scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable *by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors*." (emphasis added)). Thus, a series of transactions designed to defraud only one investor over a period of several months cannot constitute a Ponzi scheme. Since the transactions in this case cannot be classified as a Ponzi scheme, the Ponzi scheme presumption is inapplicable.

But Ehrlich does not rely solely on the Ponzi scheme presumption to establish HTG's fraudulent intent. He suggests that HTG's fraudulent intent is apparent from the Adversary Complaint itself, which "painstakingly detail[s] the business and transactional history of [HTG] and CFA." Resp. to Mot. to Dismiss at 17. Again, the Adversary Complaint alleges that HTG sold fake invoices to CFA to pay down debt it owed CFA for earlier invoices. Adversary Compl. ¶ 65. The allegedly fraudulent conveyances, then, involved HTG using cash obtained via fraud from CFA to pay down its debt to CFA. This does fit the letter of the fraudulent conveyance statutes, which require that the trustee show the debtor made a transfer with actual intent to hinder, delay, or defraud any creditors. U.S.C. § 548(a)(1)(A); N.Y. Debt. & Cred. Law § 276. HTG, the debtor, appears to have made the transfers to defraud a creditor, namely, CFA. The point of these transfers was to mollify CFA, which expected payment on the invoices it had bought. If it did not receive those payments, it would suspect that something was up. To deal with this situation, and presumably to get CFA to believe that it was good for the money, HTG created fake invoices that it then sold to CFA. Using the money obtained from these sales, HTG paid off its earlier debts, which would reassure CFA and keep the charade going. CFA seems to have bought this for a least a few months, and perhaps it would not have continued to purchase invoices from HTG if the payments had stopped coming in. This, says Ehrlich, is enough to show HTG's fraudulent intent.

Ehrlich's problem is that his argument ignores a key tenet of fraudulent conveyance law: "a debtor can fraudulently transfer only whatever he in fact owns." Richardson v. Huntington Nat'l Bank (In re CyberCo Holdings, Inc.), 382 B.R. 118, 139 (Bankr. W.D. Mich. 2008). It follows from this principle that "a debtor cannot fraudulently transfer to a creditor property that

11

has already been pledged to that creditor as collateral." Id.; accord Henry v. Lehman Commercial Paper, Inc. (In re First All. Mortg. Co.), 471 F.3d 977, 1008 (9th Cir. 2006) ("[P]ayment to a fully secured creditor does not hinder, delay or defraud creditors because it does not put assets otherwise available in a bankruptcy distribution out of their reach.").

Consider the facts of one of the seminal cases on this point, Melamed v. Lake County National Bank, 727 F.2d 1399 (6th Cir. 1984). There, the debtor received an order from a customer for a "steel slitter." Id. at 1401. The defendant had loaned the debtor hundreds of thousands of dollars, and the loan "was secured by security interests on [the debtor's] accounts receivable and inventory." Id. The customer that ordered the steel slitter made a $30,000 down payment on the machine, but instead of using the cash to finance production of the machine, the debtor "deposited it [with the defendant] and the [defendant] applied the money to [the debtor's] pre-existing indebtedness." Id. There was evidence that although the defendant knew of the debtor's precarious financial condition, that knowledge was never shared with the customer. Id. The trustee brought suit to set aside the $30,000 payment to the debtor as a fraudulent conveyance, but the court dismissed the claim. Id. at 1402. The court reasoned as follows:

> [B]ecause of the [defendant's] valid security interest in accounts receivable, that transfer did not diminish the assets of the debtor which were available to its creditors. We agree with the [defendant] that under the circumstances of this case the $30,000 transfer had no effect on the creditors of [the debtor]. It did not hinder, delay or defraud them. A payment which would never have been made to [the debtor] without the intervention of the [the defendant] and was subject to the [defendant's] security interest ended up in the [defendant's] hands. The other creditors of [the debtor] were not harmed by the transfer. This requirement for establishing a fraudulent transfer not having been met, the intent with which the transfer was made is immaterial.

12

Id.

In other words, a "debtor's assets cannot be diminished if the subject property is already secured." In re Cyberco Holdings, Inc., 382 B.R. at 139. If a transaction does not deplete the assets of a debtor's estate, it simply cannot give rise to a claim for fraudulent conveyance regardless of any evidence of the debtor's fraudulent intent. See Bear, Stearns Sec. Corp. v. Gredd, 275 B.R. 190, 196 (S.D.N.Y. 2002) ("[Section] 548(a)(1)(A) only permits a trustee to avoid a transfer of an interest of the debtor in property when, but for the transfer, such property interest would have been available to at least one of the debtor's creditors.").

Here, as discussed further below, CFA had a valid, perfected security interest in the cash HTG transferred to it in an effort to pay down HTG's debt. In the April agreement, HTG gave CFA wide-ranging security interest in its property and assets as collateral for any obligations HTG might incur to CFA. Adversary Compl. Ex. C, ¶¶ 1.15, 5. CFA perfected this security interest by filing UCC financing statements. Id. Exs. G–J. The transfers from HTG to CFA that Ehrlich attacks as fraudulent were designed to pay down debt owed by HTG to CFA. Like the debtor in Melamed, HTG was transferring property that was already secured by the transferee, CFA. These transfers could not have harmed other creditors because they involved property that belonged to CFA as a result of its perfected security interest. And as in Melamed, while there are plausible allegations of fraudulent intent on the part of HTG, that is irrelevant in light of the Court's conclusion that the cash transferred to CFA never really belonged to HTG. Ehrlich's actual fraudulent conveyance claims fail, and Judge Littlefield was right to dismiss them.[3]

_____

[3] The cases cited in the discussion of the interaction between actual fraudulent conveyance and perfected security interests held by transferees all involved the Bankruptcy Code. But the Court sees no reason why the analysis would differ when it comes to New York law. See

## C. Constructive Fraudulent Conveyance

Under § 548(a)(1)(B), a trustee may avoid a transfer made by a debtor by showing

> (1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer.

BFP v. Resolution Tr. Corp., 511 U.S. 531, 535 (1994). Similarly, under New York law, a transfer made by a debtor is deemed constructively fraudulent "if it is made without 'fair consideration'" and

> (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.

Kramer v. Chin (In re Chin), 492 B.R. 117, 126 (Bankr. E.D.N.Y. 2013) (quoting In re Sharp Int'l Corp., 403 F.3d at 53). "Fair consideration" under the DCL "comprise[s] two elements—good faith [on the part of the transferee] and the payment of a fair equivalent value for the property interest conveyed." Chen v. New Trend Apparel, Inc., 8 F. Supp. 3d 406, 447 (S.D.N.Y. 2014) (citing DCL § 272). "[R]epayment of an antecedent debt constitutes fair consideration." In re Sharp Int'l Corp., 403 F.3d at 54. And "a lack of good faith 'does not ordinarily refer to the transferee's knowledge of the source of the debtor's monies.'" Id. at 55 (quoting Bos. Trading Grp., Inc. v. Burnazos, 835 F.2d 1504, 1512 (1st Cir. 1987)).

---

In re Bayou Grp., LLC, 362 B.R. at 626 n.1 ("Because the relevant provisions of the DCL are substantially similar to Bankruptcy Code Section 548, the discussion here will focus on Section 548.").

The Court need not spend much time on Ehrlich's constructive fraudulent conveyance claims, because they must be dismissed for the same reason as the actual fraudulent conveyance claims: the transfers at issue involved property in which CFA had a perfected security interest. Constructive fraudulent conveyance under § 548 requires a transfer "of an interest of the debtor in property" just as much as actual fraudulent conveyance does. And there is no reason to think New York law differs in this respect from § 548. To repeat, HTG was transferring assets in which CFA, not HTG, had an interest as the holder of a perfected interest. Thus, any fraudulent conveyance claim, whether constructive or actual, that attempts to attack these transactions must fail.

There is, however, an independent reason for dismissing the constructive fraudulent conveyance claims that are brought under New York law. Lack of fair consideration is "[a]n essential element of a claim pursuant to DCL §§ 273, 273-a, 274, [and] 275." Atlanta Shipping Corp., Inc. v. Chem. Bank, 818 F.2d 240, 248 (2d Cir. 1987). The transfers in this case "discharged an antecedent debt and w[ere] made for a 'fair equivalent'," thus satisfying the first prong of the fair consideration test. In re Sharp Int'l, 403 F.3d at 54. And even if the Adversary Complaint had adequately alleged that CFA knew of the fraud it fell victim to—which the Court doubts—that would not have been enough to show that CFA lacked good faith in receiving the transfers. See id. at 54 ("[A] lack of good faith 'does not ordinarily refer to the transferee's knowledge of the source of the debtor's monies.'" (quoting Bos. Trading Grp., 835 F.2d at 1512)). Thus, the New York constructive fraudulent conveyance claims could be dismissed for this reason alone.

**D. Standing and In Pari Delicto**

As CFA points out, several of Ehrlich's other claims—breach of fiduciary duty[4] (and aiding and abetting thereof), breach of contract, and breach of the covenant of good faith and fair dealing—depend on the allegation that "CFA somehow, through action or inaction, caused or participated in the wrongdoing of Gael Coakley and HTG." Appellee Br. at 13. It bears repeating that HTG's counsel conceded that CFA was a net loser in these transactions, Hearing Tr. at 26:23, and that CFA appears to have lost over one million dollars as a result of its dealings with HTG, Adversary Compl. ¶ 17. CFA argues that HTG's role in perpetrating the fraud it fell victim to deprives Ehrlich of standing to bring these claims in addition to providing CFA with an affirmative defense under the "in pari delicto" doctrine. Appellee Br. at 13–15. The Court agrees.

New York law[5] forbids "one wrongdoer [from] . . . recover[ing] against another." Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC.), 721 F.3d 54, 63 (2d Cir.

---

[4]  The breach of fiduciary duty claim is directed entirely at Coakely's conduct, not CFA's: "As a result of Coakley's breach of his fiduciary duties to [HTG], [HTG] has sustained damages." Adversary Compl. ¶ 185. Since this claim is not targeted at CFA's conduct, and since Coakley is not a defendant in this action, the Court must dismiss the claim.

[5]  Although the governing agreement between CFA and HTG provides for application of Georgia law, Adversary Compl. Ex. C, ¶ 11, Georgia law recognizes the defense of in pari delicto, and there is no reason to believe Georgia's version of the doctrine would produce a different result here, see Post-Confirmation Comm. for Small Loans, Inc. v. Innovate Loan Servicing Corp., No. 13-CV-191, 2015 WL 5769229, at *8 (M.D. Ga. Sept. 30, 2015) (finding that Georgia law recognizes the in pari delicto defense and applying that defense to a fraudulent transfer claim). The Court therefore applies New York law. See Bronx Chrysler Plymouth, Inc. v. Chrysler Corp., 212 F. Supp. 2d 233, 250 n.12 (S.D.N.Y. 2002) (finding that, while several relevant contracts contained choice-of-law clauses stating that Michigan law governed, no actual conflict existed between New York law and Michigan law on the pertinent legal issue, and therefore the court would "apply New York law, the law of the forum in which it sits"); see also Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) ("It is only when it can be said that there is no actual conflict [of laws] that New York will dispense with a choice of law analysis.").

2013). This is known as the doctrine of in pari delicto, and it "has been wrought in the inmost texture of our common law for at least two centuries." Kirschner v. KPMG LLP, 938 N.E.2d 941, 949 (N.Y. 2010). In pari delicto is rooted in "the idea that 'where parties are equally at fault, the defending party is in the stronger position.'" Grubin v. Rattet (In re Food Mgmt. Grp., LLC), 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008) (quoting Ross v. Bolton, 904 F.2d 819, 824 (2d Cir. 1990)). Further, the doctrine focuses on "the plaintiff's participation in the same wrongdoing as the defendant." Terlecky v. Hurd (In re Dublin Sec., Inc.), 133 F.3d 377, 380 (6th Cir. 1997) (quoting Bubis v. Blanton, 885 F.2d 317, 321 (6th Cir. 1989)); see also Deangelis v. Corzine (In re MF Glob. Holdings Ltd. Inv. Litig.), 998 F. Supp. 2d 157, 189 (S.D.N.Y. 2014) ("[In pari delicto] prohibits one party from suing another where the plaintiff was 'an active, voluntary participant in the unlawful activity that is the subject of the suit.'" (quoting Pinter v. Dahl, 486 U.S. 622, 636 (1988))). In pari delicto "requires intentional conduct on the part of the plaintiff or its agents." Flaxer v. Gifford (In re Lehr Constr. Corp.), 551 B.R. 732, 738 (S.D.N.Y. 2016) (quoting Sacher v. Beacon Assocs. Mgmt. Corp., 980 N.Y.S.2d 121, 124 (App. Div. 2014)). "As a procedural matter, an in pari delicto defense can sometimes be resolved on a motion to dismiss." ImagePoint, Inc. v. JPMorgan Chase Bank, Nat'l Ass'n, 27 F. Supp. 3d 494, 515 (S.D.N.Y. 2014).

Under the Wagoner rule, which is related to but distinct from in pari delicto, "[w]here 'a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors.'" Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp., Inc.), 336 F.3d 94, 100 (2d Cir. 2003) (quoting Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991)). "Because

management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the Wagoner rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." Wight v. BankAmerica Corp., 219 F.3d 79, 87 (2d Cir. 2000). "[B]oth the Wagoner rule and in pari delicto doctrine 'are grounded in substantive agency law, and identical tests appear to apply to both doctrines . . . ." Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA), 524 B.R. 488, 532 (Bankr. S.D.N.Y. 2015). But while the two rules are similar, the Wagoner rule "functions as a prudential standing limitation," and in pari delicto is an affirmative defense. Carney v. Horion Invs. Ltd., 107 F. Supp. 3d 216, 228 (D. Conn. 2015).

The claims for breach of contract, breach of the covenant of good faith and fair dealing, and aiding and abetting breach of fiduciary duty are all subject to dismissal under Wagoner and in pari delicto.[6] These claims are premised on the idea that CFA contributed to HTG's insolvency and harmed other creditors by taking part in the scheme by which HTG defrauded it. Adversary Compl. ¶¶ 168, 179, 185, 193–94. For example, the breach of contract claim is based, among

---

[6] The fraudulent conveyance claims are not subject to attack on standing or in pari delicto grounds because "§§ 548 and 549 both expressly provide that the 'trustee may avoid' the fraudulent transactions described in each provision, and we have recognized that '[t]he trustee of a bankrupt estate has broad powers under the Bankruptcy Code to avoid certain transfers of property made by the debtor either after or shortly before the filing of the bankruptcy petition.'" Glinka v. Murad (In re Housecraft Indus. USA, Inc.), 310 F.3d 64, 71 (2d Cir. 2002) (alteration in original) (quoting Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52, 55 (2d Cir. 1997)); accord Picard v. Taylor (In re Park S. Sec., LLC), 326 B.R. 505, 513 (Bankr. S.D.N.Y. 2005) ("The Wagoner Rule does not . . . apply to causes of action that the Bankruptcy Code specifically confers on a trustee or a debtor in possession."); Tese–Milner v. Beeler (In re Hampton Hotel Inv'rs, L.P.), 289 B.R. 563, 580 (Bankr. S.D.N.Y. 2003) ("It would be turning the Wagoner Rule and concepts of in pari delicto on their heads to hold that the Trustee lacks standing to recover . . . payments [on the ground that they were fraudulent conveyances].").

other things, on Ehrlich's assertion that "CFA extended funds to [HTG] far in excess of the *maximum* dollar amount set forth in the Loan and Security Agreement." Id. ¶ 162. This alleged breach caused HTG to "sustain[] damages, including but not limited to, an amount measured by the destruction of its business and the funds that were paid to CFA by [HTG]." Id. ¶ 168. The chutzpah of this argument is striking. Ehrlich, who stands in HTG's shoes as its trustee, is pointing the finger at CFA for contributing to HTG's demise when it was CFA that lost over a million dollars as a result of the fraud HTG perpetrated on it.

There is no question here that HTG was "at equal or greater fault than [CFA]" in the transactions at issue. Globaltex Grp. Ltd. v. Trends Sportswear Ltd., No. 09-CV-0235, 2010 WL 1633438, at *4 (E.D.N.Y. Apr. 21, 2010). Again, HTG defrauded CFA out of a large sum of money by selling it phony invoices and using the proceeds of those invoices to pay off earlier invoices. Even if CFA knew about the scheme, which is far from clear from the Adversary Complaint,[7] HTG bears the lion's share of the blame for a fraud that it engineered and that resulted in CFA losing over a million dollars. See In re Bernard L. Madoff Inv. Sec. LLC., 721 F.3d at 64 ("[The trustee] alleges that the Defendants were complicit in Madoff's fraud and facilitated his Ponzi scheme by providing (well-paid) financial services while ignoring obvious warning signs. These claims fall squarely within the rule of Wagoner and the ensuing cases: [the

---

[7] It remains unclear why CFA would keep participating in the challenged transactions if it knew about the fraud. How would CFA benefit from continuing to provide HTG with money in exchange for accounts receivable that it knew did not exist? Ehrlich never answers this question, and it casts serious doubt on the suggestion that CFA knew it was being bilked. If, as seems likely, CFA was indeed unaware of the fraud it fell victim to, application of in pari delicto would be particularly apt, because "[t]he justice of the in pari delicto rule is most obvious where a willful wrongdoer [such as HTG] is suing someone who is alleged to be merely negligent [such as CFA]." Kirschner, 938 N.E.2d at 950.

trustee] stands in the shoes of [Madoff's organization] and may not assert claims against third parties for participating in a fraud that [it] orchestrated."). Ehrlich simply "has no standing to assert [these claims] against [CFA] for cooperating in the very misconduct that it . . . initiated." Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 826 (2d Cir. 1997). Thus, the claims for breach of contract, breach of the covenant of good faith and fair dealing, and aiding and abetting the breach of fiduciary duty must be dismissed.

### E.  Breach of Contract and Declaratory Judgment

Ehrlich seeks a declaratory judgment to the effect that CFA never had a valid security interest in the transfers HTG made to it. Adversary Compl. ¶ 157. Ehrlich also alleges that CFA is liable for breach of contract because it "extended funds to [HTG] far in excess of the *maximum* dollar amount set forth in the Loan and Security Agreement." Id. ¶ 162. The Court has already held that Ehrlich cannot bring the breach of contract claim. In any event, both the breach of contract claim and the request for a declaratory judgment are meritless.

The goal of contract interpretation under New York law[8] "is to give effect to the intent of the parties as revealed by the language of their agreement." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 157 (2d Cir. 2000). "[I]n searching for the probable intent of the parties, lest form swallow substance, our goal must be to accord the words of the contract their 'fair and reasonable meaning.'" Sutton v. E. River Sav. Bank, 435 N.E.2d 1075 (N.Y. 1982) (quoting Heller v. Pope, 164 N.E. 881, 882 (N.Y. 1928)). "New York law gives full effect to merger clauses," Roberts v. Edith Roman

---

[8]  Again, while the parties selected Georgia law to govern interpretation of the agreement, Adversary Compl. Ex. C, ¶ 11, the Court applies New York law because there is no indication Georgia law would produce a different result.

Holdings, Inc., No. 10-CV-4457, 2011 WL 2078223, at *3 (S.D.N.Y. May 19, 2011), but "a merger clause may be overcome when the contracts are executed by the same parties and for the same purpose and the parties' intent would be 'promote[d]' rather than 'undermine[d],'" Ocwen Loan Servicing v. Rescap Liquidating Tr. (In re: Residential Capital, LLC), 533 B.R. 379, 397–98 (Bankr. S.D.N.Y. 2015) (alterations in original) (quoting VoiceAge Corp. v. RealNetworks, Inc., 926 F. Supp. 2d 524, 530 (S.D.N.Y. 2013)).

Ehrlich argues that CFA lacks a valid security interest in the transfers at issue because the operative agreement is the one executed in March 2011, and that agreement fails to provide any description of the collateral that could satisfy CFA's security interest. Resp. to Mot. to Dismiss at 11. But the agreement entered into in April 2011, which superseded the March agreement, Adversary Compl. Ex. C, ¶ 21, contains a description of the collateral that Ehrlich does not contest is specific enough to create a valid security interest, id. ¶ 5. CFA perfected this security interest by filing the appropriate UCC financing statements. Id. Exs. G–J. Ehrlich also argues that CFA's security interest does not cover the debts HTG incurred to CFA by selling it phony invoices. Resp. to Mot. to Dismiss at 13. That is incorrect. The April agreement defines CFA's "security interest" as "the security interest . . . granted by [HTG] to [CFA] as collateral for the payments of any and all obligations." Id. Ex. C, ¶ 1.15. "Obligations," in turn, includes "all . . . obligations of ours to you, *however and whenever created*, arising or evidenced, whether direct or indirect, through assignment from third parties in the ordinary course of your business, absolute, contingent or otherwise, now or hereafter existing or due to become due." Id. ¶ 1.7 (emphasis added). This clause makes it clear that there is no merit to Ehrlich's contention that "obligations" under the April agreement "is limited to amounts due under the April Agreement."

Resp. to Mot. to Dismiss at 13. To the contrary, HTG's "obligations" included cash it owed CFA for the phony invoices it sold. The Court must therefore dismiss Ehrlich's claim seeking a declaratory judgment to the effect that CFA does not have a valid security interest in the money HTG defrauded it out of.

Ehrlich's breach of contract claim fares no better. He says that CFA was not allowed to accept payments directly from HTG, but that is belied by the language of the March and April agreements, which both contemplate a situation in which HTG receives payments on CFA's invoices and then turns those payments over to CFA. Adversary Compl. Ex. A, ¶ 46; id. Ex. C, ¶ 8. Ehrlich also argues that CFA exceeded the maximum amount it could lend HTG under the April agreement. Resp. to Mot. to Dismiss at 15. That agreement says that CFA could lend HTG a maximum of $250,000. Adversary Compl. Ex. C, ¶ 2.1. Ehrlich acknowledges that the parties later entered supplemental agreements that ultimately extended the line of credit to $1,400,000. Resp. to Mot. to Dismiss at 15. But, Ehrlich says, these addenda purport to supplement only the March agreement, not the April one, even though the April agreement contains a merger clause stating that it represents the entire agreement between the parties. Id. That at least raises questions about the enforceability of the addenda. Id.

True enough, the addenda do say they cover only the March agreement. Adversary Compl. Exs. E–F. And enforcement of the merger clause in the April agreement would cast doubt on the validity of the addenda. But under New York law, a court need not enforce a merger clause if doing so would frustrate the intentions of the parties and the contracts at issue were entered into by the same parties and for the same purpose. In re Residential Capital, LLC, 533 B.R. at 397–98. It remains a mystery why the parties used the addenda to modify an agreement

that had been superseded by a later agreement covering the same subject matter. The most plausible explanation is that there was a drafting error, which under New York law may be taken into account in determining how best to carry out the parties' intent. See Harris v. Uhlendorf, 248 N.E.2d 892, 894 (N.Y. 1969) ("Where there is no mistake about the agreement, and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected." (quoting Born v. Schrenkeisen, 17 N.E. 339, 341 (N.Y. 1888))). What is clear is that it would undermine the parties' intent to use the merger clause in the April agreement to find that the increases in HTG's line of credit effected by the addenda are invalid, and that therefore CFA is liable for breach of contract for extending the line of credit. Thus, Ehrlich's breach of contract claim fails.

### F. Equitable Subordination and Unjust Enrichment

Ehrlich's remaining claims are for equitable subordination and unjust enrichment. The unjust enrichment claim can be disposed of quickly, because such a claim must be dismissed if, as the Court just found, the relationship between the parties was governed by a valid contract. See Moses v. Apple Hosp. Reit Inc., No. 14-CV-3131, 2015 WL 1014327, at *6 (E.D.N.Y. Mar. 9, 2015) ("[W]hen a valid, enforceable contract exists, courts dismiss unjust enrichment claims because the parties' relationship is said to be governed by the terms of the contract." (citing Matana v. Merkin, 957 F. Supp. 2d 473, 495 n.10 (S.D.N.Y. 2013))).

Under 11 U.S.C. § 510(c), a court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." "Equitable subordination is an extraordinary remedy that is to be used sparingly." Kalisch v.

Maple Trade Fin. Corp. (In re Kalisch), 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008). To equitably subordinate the claim of a non-insider such as CFA that has not "dominated or controlled the debtor to gain an unfair advantage," LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.), 511 B.R. 253, 348 (Bankr. S.D.N.Y. 2014), the trustee must show that the non-insider committed a "breach of an existing, legally recognized duty arising under contract, tort or other area of the law," 80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.), 169 B.R. 832, 838 (Bankr. S.D.N.Y. 1994). "In the absence of a contractual breach, the [trustee] must demonstrate fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity." Id.

For reasons that should be clear by now, Ehrlich has failed to show that CFA engaged in conduct warranting the harsh remedy of equitable subordination. He cannot show that CFA breached any of the agreements it entered into with HTG, that CFA committed a tort against HTG, or indeed that CFA breached any legal duty it owed to HTG. The Adversary Complaint also fails to allege "fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity." In re 80 Nassau Assocs., 169 B.R. at 838. Again, HTG bilked CFA out of over a million dollars over the course of several months. Any allegation that CFA knowingly participated in a fraudulent scheme in which it would have to end up as a net loser is implausible. It also strains credulity to say that despite CFA's valid security interest in the cash it was defrauded out of by HTG, the money should now be returned to Ehrlich. Accordingly, Judge Littlefield was correct to dismiss the equitable subordination claim.

**V.     CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Appellant Marc S. Ehrlich's Appeal (Dkt. No. 1 at 9–10) is **DENIED**; and it is further

**ORDERED**, that the January 13, 2016 Order (Dkt. No. 1 at 6–8) of the Bankruptcy Court dismissing the Adversary Complaint in its entirety is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:         February 22, 2017
               Albany, New York

Lawrence E. Kahn
U.S. District Judge